No. 16-5053

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Kathey-Lee Galvin, *et al.*

Plaintiffs—Appellants

v.

The United States of America

Defendant—Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
District Court Case No. 1:14-cv-01761-RCL

## BRIEF OF APPELLANTS

Philip M. Musolino, Esq. #294652
Musolino & Dessel PLLC
1615 L Street, NW Suite 440
Washington, DC 20036
Phone: (202) 466-3883
Fax:  (202) 775-7477
pmusolino@musolinoanddessel.com

*Attorney for Appellant Kathey-Lee Galvin, et al.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Kathey-Lee Galvin,** *et al.***,** | : |
| **Plaintiffs-Appellants,** | : |
| | : |
| | : |
| | :   Case No. 16-5053 |
| | : |
| **United States of America** | : |
| **Defendant-Appellee.** | : |
| | : |

## CERTIFICATE AS TO PARTIES RULINGS, AND RELATED CASES PURSUANT TO RULE 28(a)(1)

Pursuant to D.C. Circuit Rule 28(a)(1), Appellants Kathey-Lee Galvin and Blaise

Pellegrin hereby certifies as follows:

### A.  Parties and Amici:

Kathey-Lee Galvin ("Galvin,") and Blaise Pellegrin ("Pellegrin,"together herein

after "Appellants") were Plaintiffs in the District Court and are Appellants in this Court.

The United States of America was Defendant in the District Court and is Appellee

in this Court.

There was no amicus in the district court. There is no amicus in this Court.

### B.  Ruling Under Review:

The ruling under review is the Order of the Honorable Royce C. Lamberth, Judge,

United States District Court for the District of Columbia, entered March 9, 2016, granting

the Motion of the Defendant, the United States of America, to Dismiss the Complaint,

and denying the Motion of Plaintiff for Leave to File a Supplemental Memorandum. ECF

16.

The aforementioned Order is attached hereto.

**C. Related Cases:**

The case on review is not and has been before this, or any other court. Counsel is aware of no related cases currently pending or in any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

_____/s/_____
Philip M. Musolino #294652
Musolino & Dessel, PLLC
1615 L Street, NW, Suite 440
Washington, DC 20036
Phone: (202) 466-3883
Fax: (202) 775-7477
Email: pmusolino@musolinoanddessel.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a true copy of the following was served this 29th day of March 2016 on counsel for Appellee via the court's ECF system.

_____/s/_____
Philip M. Musolino

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KATHEY-LEE GALVIN, *et al.*,** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Civil Case 14-CV-1761 (RCL)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant** | ) | |
| | ) | |

## ORDER

Upon consideration of defendant's motion to dismiss, ECF No. 7, the opposition thereto, the corrected reply memorandum, and the record herein, defendant's motion to dismiss is **GRANTED** as the "foreign country" exception to the Federal Tort Claims Act deprives this Court of jurisdiction over the negligence claims in this case.

Plaintiff's motion for leave to file a supplemental memorandum, ECF No. 15, is **DENIED**.

This case shall stand **DISMISSED WITH PREJUDICE**.

Signed by Royce C. Lamberth, United States District Judge, March 8, 2016.

# Table of Contents

**Table of Authorities** ............................................................................. ii

**Glossary of Abbreviations** ................................................................... vi

**Statement of Appellate Jurisdiction** ...................................................... 1

**Standards of Appellate Review** ............................................................ 1

**Statement Of Issues Presented For Review** ........................................... 3

**Statement of the Case** ......................................................................... 3

**Statement of the Facts** ........................................................................ 5

**Summary of the Argument** ................................................................... **7**

**Argument** ............................................................................................ **8**

The Foreign Country Exception to the FTCA Does Not Bar Plaintiffs' Claims Against the United States ................................................................................................... 8

**Conclusion** ....................................................................................... **26**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Al-Zahrani v. Rodriguez,*
    669 F.3d 315 (D.C. Cir. 2012) ................................................................ 17

*Al-Zahrani v. Rumsfeld,*
    684 F. Supp. 2d 103 (D.D.C. 2010) aff'd ............................................... 17

*Arnett v. C.I.R.,*
    473 F.3d 790 (7th Cir. 2007) ................................................................... 9

*\*Beattie v. United States,*
    756 F. 2d 91 (D.C. Cir. 1984) ......................................................... 8, 9, 16

*Broadnax v. United States*
    710 F.2d 865 (D.C.Cir. 1983) (per curiam) .............................. 22, 23, 25

*Ellenbogen v. The Can. Embassy,*
    2005 WL 3211428 (D.D.C. 2005).......................................................... 11

*Heller v. United States,*
    776 F.2d 92 (3d Cir.1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1948,
    90 L.Ed.2d 358 (1986) .......................................................................... 23

*Hohri v. U.S.,*
    793 F.2d 304 (D.C. Cir. 1986) .............................................................. 15

*Howe v. Embassy of Italy,*
    2014 WL 4449697 (D.D.C. 2014).......................................................... 11

*Iskandar v. Embassy of the State of Kuwait,*
    2015 WL 3413456 (D.D.C. May 28, 2015) ........................................... 11

*King v. Burwell,*
    576 U.S.——, 135 S.Ct. 2480 (2015) .................................... 1, 2, 3, 4, 22

*LaShawn v. Barry,*
    87 F.3d 1389 (D.C. Circ. 1996)............................................................. 15

*Macharia v. United States*
    334 F.3d 61 (D.C. Cir. 2003) ........................................... 22, 23, 25, 26

*Meredith v. United States,*
   330 F.2d 9 (9th Cir. 1964) ........................................................... 8, 24, 25

*New Hampshire v. Maine,*
   532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) ........................................ 15

*Persinger v. Islamic Republic of Iran,*
   729 F.2d 835 (D.C. Cir. 1984) ........................................................... 10

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2010) ........................................................... 27

*Shekoyan v. Sibley Int'l,*
   409 F.3d 414 (D.C. Cir. 2005) ........................................................... 9

*Sloan v. U.S. Dep't of Hous. & Urban Dev.,*
   236 F.3d 756 (D.C. Cir. 2001) ........................................................... 1

*Smith v. United States,*
   507 U.S. 197, 113 S. Ct. 1178, 122 L. Ed. 2d 548 (1993) ........................... 8, 9, 16

*Underwood v. United Republic of Tanzania,*
   1995 WL 46383 (D.D.C. 1995) ........................................................... 11

*\*United States v. Corey,*
   232 F.3d 1166 (9th Cir. 2000) ...........................................12, 13, 14, 15, 24, 25, 26

*United States v. Erdos,*
   474 F.2d 157 (4th Cir. 1973) ........................................................... 15, 26

*United States v. Gatlin,*
   216 F.3d 207 (2d Cir. 2000) ........................................................... 15

*United States v. Spelar,*
   338 U.S. 217, 70 S. Ct. 10, 94 L. Ed. 3 (1949) ........................................ 17, 21

*Wyatt v. Syrian Arab Republic,*
   2015 WL 1623937 (D.D.C. 2015) ........................................................... 18

*Yan Zhao v . United States,*
   2013 WL 2945157 (W.D.N.Y. 2013) ........................................................... 15

**Federal Statutes**

18 U.S.C. § 7(3) ........................................................... 12, 15

26 U.S.C. § 911 ........................................................... 9

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1346(b)(1) ........................................................................ 1

28 U.S.C.§ 1608(a) ............................................................................ 12

28 U.S.C. § 2680(a) ........................................................................... 23

28 U.S.C. §§ 2680(k) ....................................................................... 3, 8

22 USC § 291 .................................................................................... 18

Affordable Care Act, 42 U.S.C. § 18031 ........................................... 2

Federal Tort Claims Act ...................... 1, 3, 4, 7, 8, 9, 16, 17, 21, 22, 23, 24

Foreign Sovereign Immunities Act ............................................. 10, 11

## Rules

Fed. R. App. P. 32(a)(5) .................................................................. 28

Fed. R. App. P. 32(a)(6) .................................................................. 28

Fed. R. App. P. 32(a)(7)(B)(i) ......................................................... 28

Fed. R. App. P. 32(a)(7)(B)(iii) ....................................................... 28

## Constitutional Provisions

U.S. Const. Article VI, § 2 .............................................................. 21

## Other Authorities

Arturo E. Balbastro, *Right of Diplomatic Asylum* 34 PHIL. L.J. 343, 348
   (1959) ......................................................................................... 16

Daniel Capone, *Diplomatic Asylum: A New Path Forward,* 41 N.C.J. Int'l
   L. ........................................................................................... 18, 21,

http://diplomacy.state.gov/discoverdiplomacy/diplomacy101/places/170537.
   htm (accessed June 23, 2015)..................................................... 11

Restatement (Second) of Foreign Relations Law § 77 (1965) ................... 16

The Vienna Convention on Diplomatic Relations 23 U.S.T. 3227, 500
   U.N.T.S. 95 Article 1 ................................................................. 18

The Vienna Convention on Diplomatic Relations 23 U.S.T. 3227, 500
    U.N.T.S. 95 Article 22 ........................................................................ 19

The Vienna Convention on Diplomatic Relations 23 U.S.T. 3227, 500
    U.N.T.S. 95 Article 29 ........................................................................ 20

The Vienna Convention on Diplomatic Relations 23 U.S.T. 3227, 500
    U.N.T.S. 95 Article 30 ........................................................................ 20

The Vienna Convention on Diplomatic Relations 23 U.S.T. 3227, 500
    U.N.T.S. 95 Article 31 ........................................................................ 20

*Authorities upon which we chiefly rely are marked with asterisks

## Glossary of Abbreviations

"FTCA" refers to the Federal Tort Claims Act

"DOS" refers to the Department of State

"VCDR" refers to the Vienna Convention on Diplomatic Relations.

"FSIA" refers to the Foreign Sovereign Immunities Act

"SOFA" refers to the Status of Forces Agreement

## STATEMENT OF APPELLATE JURISDICTION

This case is based on the claim of negligence brought by Plaintiffs Kathey-Lee Galvin ("Galvin") and her husband Blaise Pellegrin (collectively, "Plaintiffs" or "Appellants"). The complaint was filed in the United States District Court for the District of Columbia on October 21, 2014 (J.A. at 008-18). Subject matter jurisdiction in the district court was based on 28 U.S.C. § 1346(b)(1). The district court granted the motion of Defendant, the United States of America ("United States" or "Appellee") to dismiss on March 9, 2016 (J.A. at 004). Plaintiffs timely appealed on March 11, 2016. (J.A. at 005-7). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARDS OF APPELLATE REVIEW

This Court reviews the dismissal of a Federal Tort Claims Act ("FTCA") complaint *de novo*. *Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001).

In *King v. Burwell*, 576 U.S.——, 135 S.Ct. 2480 (2015) the Supreme Court announced a rule of statutory construction which illuminates the plain meaning test for statutory construction. As the Court explained: "If the statutory language is plain, [it] must [be] enforce[ed][ ] according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." 135 S.Ct. 2480, 2483 (emphasis added) (citations and

internal quotation marks omitted); *Id*., at 2495 (finding that while provision of

Affordable Care Act, 42 U.S.C. § 18031, "may seem plain when viewed in

isolation, such a reading turns out to be untenable in light of the statute as a whole"

(citations and internal quotation marks omitted)).

The *King v. Burwell* decision expands the scope of a reviewing court's task

by imposing on that court the obligation to assess and correlate with the provision

in issue "the overall statutory scheme;" and the "legislative plan;" and, it

prescribed an analytical framework pursuant to which the Court assesses the actual

– that is, the factually provable – effect of a provision on the scheme or plan. Thus,

the Court wrote:

> Congress passed the Affordable Care Act to improve health insurance
> markets, not to destroy them. If at all possible, we must interpret the
> Act in a way that is consistent with the former, and avoids the latter.
> Section 36B can fairly be read "...consistent with what we see as
> Congress's plan, and that is the reading we adopt.

*Id*., at 2496.  That is, a court tasked with the application of a statute must "depart

from what would otherwise be the most natural reading of the pertinent statutory

phrase" if that reading "could well" lead to a consequence which was not intended.

Each court applying statutory language must, therefore, look beyond the

"natural reading" of a statute, and, further, must look beyond the objectively-

construed language of other provisions of the legislation to ensure that the court's

construction does not thwart in some material way any of the goals of the

legislation, as those goals are discerned by the court.

Thus, in applying *King v. Burwell* here, the Court should, with the goal of

ameliorating adverse but unpredicted consequences, look to the effect of the

alternative interpretations urged by the parties on those claimants situated similarly

to Plaintiffs.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the trial court erred as a matter of law when it granted the Motion

   of Defendant to dismiss Plaintiffs' claims on the basis of the Foreign

   Country Exception, 28 U.S.C. §§ 2680(k), to the FTCA, 28 U.S.C. §§ 2671–

   80.

## STATEMENT OF THE CASE

On October 21, 2014 Plaintiffs filed against the United States of America

("United States" or "US")) a complaint under the FTCA. The Complaint arose out

of injuries sustained byKathey-Lee Galvin, as an employee of the Department of

State ("DOS"), and her husband, in US- provided housing during the 2010

earthquake in Haiti. (JA 008-18).

On May 21, 2015, the US filed a Motion to Dismiss on the basis of, among

other things, the FTCA's Foreign Country Exception(the "US Motion" or the

"Motion to Dismiss"). (ECF 7).

3

On June 23, 2015 Plaintiffs timely filed their Opposition to the United States of America's Motion to Dismiss. (ECF 9).

On July 22, 2015 Defendants filed the Reply Memorandum In Support Of The United States Of America's Motion To Dismiss (ECF 13).

On August 8, 2015 Plaintiffs filed a Motion For Leave To File A Limited Supplemental Memorandum Addressing The Effect Of *King V. Burwell.* (ECF 15).

On March 9, 2016, the court by order, but without an accompanying memorandum, granted the motion to dismiss, writing that "the 'foreign country' exception to the Federal Tort Claims Act deprives this Court of jurisdiction over the negligence claims in this case." (J.A. at 004).

Plaintiffs timely noted their appeal on March 11, 2016 (J.A. at 005-7).

On June 2, 2016 Plaintiffs filed a Motion for Summary Reversal (Doc. 1616361) and, the United States filed a Motion for Summary Affirmance. (Doc. 1616249).

On June 16, 2016 the United States filed an Opposition to Appellants' Motion for Summary Reversal (Doc. 1619724) and Plaintiffs filed an Opposition to the United States' Motion for Summary Affirmance. (Doc. 1619818).

On June 27, 2016 Plaintiffs filed a Reply in Support of their Motion for Summary Reversal (Doc. 1621961) and the United States filed Reply in support of its Motion for Summary Affirmance. (Doc. 1621911).

On July 27, 2016, this court denied both motions. (Doc. 1627355).

## STATEMENT OF THE FACTS

As the complaint averred:  Plaintiff Galvin was at all times pertinent hereto employed by the Department of State ("DOS"). JA 009, at ¶ 5.  DOS assigned Galvin to the position of Political Officer, US Embassy, Haiti. *Id*., at ¶7.  DOS informed Galvin that DOS would provide housing to Galvin and co-plaintiff Pellegrin. *Id*., at ¶8.  DOS secured for Galvin and Pellegrin housing located in Port-au-Prince, Haiti (the "DOS Housing").  *Id*., at ¶9.

Unknown to plaintiffs, the structure of the Housing was not comparable to the minimal requirements imposed by DOS on other housing it acquired in Haiti. *Id*., at ¶12.

On or about January 12, 2010, an earthquake struck Haiti. Plaintiffs were inside the Housing at the time of the earthquake. JA 010, at ¶14. As a result of the earth movement caused by the earthquake, the Housing was destroyed, and plaintiffs and each of them sustained serious and permanent physical and emotional injuries. *Id*., at ¶15.

Plaintiff Galvin further attested below that:

1. I am currently employed by the United States Department of State as a Foreign Service Officer.

5

2. In September 2008 I began my work for the Department of State in Port-au-Prince, Haiti as a Political/Human Rights officer. In this position I am considered a diplomatic agent under the Vienna Convention.

3. As a diplomat, I arrived in Haiti with a diplomatic visa and received diplomatic credentials afterward. The Mission maintained these credentials for me at all times during my service.

4. I was on call with the Department of State twenty-four hours a day, seven days a week, even when in my residence....

5. The Department of State told me that while I was in Haiti, and in my residence, I was protected by diplomatic immunity. The Department of State made it clear the Haitian government could not enter my residence without permission.

6. My residence was protected by Embassy Diplomatic Security.

7. Rent, utilities, water, and telephone service at my residence were paid for by the Department of State.

8. Furniture for my residence was provided by the Department of State.

9. Maintenance and repair matters were handled by the Department of State.

10. I traveled from my residence to work in an armored shuttle provided by the Department of State. This form of transportation was mandated by the Department of State, which disallowed the use of private vehicles to and from work.

11. On January 12, 2010 an earthquake struck Haiti. My husband, Blaise, and I were both inside my residence at the time.

12. I sustained many debilitating injuries in this earthquake. I was pinned from the collarbone down under a block of concrete that

6

fell from my residence.  I saw my bloody and mangled leg lying off to my right.

13. In order to receive real medical attention for our injuries, Blaise and I had to be strapped to boards and carried down a hill before being medevaced out the next day. This process took twelve hours or more....

15. In addition to my leg injuries, my orbital floor burst, and I had to have a plate put in to fix it, but my eye still droops and the screws holding my eye together threaten to push through the skin.

16. My husband, Blaise, sustained life threatening injuries from the earthquake as well....

21. I remained in the hospital for approximately fifty days.

Declaration of Kathey-Lee Galvin, J.A. at 034-7 at ¶¶ 1-25.

## SUMMARY OF THE ARGUMENT

The foreign country exception to the FTCA does not bar Plaintiffs' claims against the United States because the injuries were sustained on property which was under the control of and utilized for the diplomatic purposes of the United States Embassy for Haiti. The foreign country exception in the FTCA should not be construed to include injuries sustained on Embassy controlled property.

## ARGUMENT

### The Foreign Country Exception to the FTCA Does Not Bar Plaintiffs' Claims Against the United States

Through the FTCA, federal district courts:

"shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages...for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

The provisions of the FTCA, however, do not apply to " …(k) Any claim arising in a foreign country." 28 U.S.C. § 2680(k).

"Foreign country" is not defined in the FTCA. "The words 'foreign country' are not words of art, carrying a fixed and precise meaning in every context." *Meredith v. United States*, 330 F.2d 9, 10 (9th Cir. 1964). Rather, "(f)oreign country' is a fluid concept…." *Beattie v. United States*, 756 F. 2d 91, 98 (D.C. Cir. 1984) *abrogated by Smith v. United States*, 507 U.S. 197, 113 S. Ct. 1178, 122 L. Ed. 2d 548 (1993).

In analyzing whether the term "foreign country" in the FTCA applied to Antarctica, the Supreme Court looked to a dictionary definition of a "region or tract of land," but noted that "this is not the only possible interpretation of the term, and it is therefore appropriate to examine other parts of the statute before making a final determination." *Smith v. United States*, 507 U.S. 197, 201, 113 S.

Ct. 1178, 1181, 122 L. Ed. 2d 548 (1993). In *Arnett v. C.I.R.*, 473 F.3d 790, 794-95

(7th Cir. 2007), the Seventh Circuit looked to *Smith*, and concluded that, as in

*Smith's* application of the term "foreign country" to the FTCA, "the term 'foreign

country,' as employed in section 911[1] is ambiguous." *Arnett*, 473 F.3d at 794-95.

As the *Beattie* court observed:  "Congress is capable of defining it very

differently for different reasons." *Beattie v. United States*, 756 F. 2d at 98. But

*Beattie* clearly recognized that decisions interpreting a term in other statutory

contexts can be persuasive, explaining:

> Plaintiff also lists a potpourri of cases and statutes which have
> decided, in other contexts, that Antarctica was not a foreign country or
> a foreign state. By themselves, none of these cases would be
> persuasive, since they all involve interpretations of other statutes with
> other purposes….But these cases have a cumulative effect which is
> persuasive. They demonstrate that across a broad scheme of
> regulations Congress and the courts have consistently determined that
> Antarctica does not satisfy any definition of "foreign country."
> For example, in *Larry R. Martin v. Commissioner* the Tax Court held
> that Antarctica was not a foreign country within the meaning of
> income tax regulations which define "foreign country" as follows:
> The term "foreign country" means territory under the sovereignty of a
> government other than that of the United States….

*Beattie v. United States*, 756 F. 2d at 98. Resort to the interpretation given by

courts to similar provisions in analogous statutes is an uncontroversial tool of

statutory construction. *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 421 (D.C. Cir. 2005)

("The Courts have also read similar provisions in analogous statutes narrowly.")

---

[1] 26 U.S.C. § 911(the Internal Revenue Code).

In *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 839 (D.C. Cir. 1984), this Circuit construed the statutory phrase "all territory and waters ... subject to the jurisdiction of the United States" in order to address whether claims could be brought under the Foreign Sovereign Immunities Act ("FSIA") against Iran for actions that took place in the US Embassy in Iran. The Court concluded that Iran's sovereign immunity was preserved, and explained:

> In section 1603(c), Congress used the words "continental or insular" to modify the scope of the phrase "all territory and waters ... subject to the jurisdiction of the United States." *The latter phrase, if it stood alone, might lead to the conclusion that any territory over which the United States exercises any form of jurisdiction constitutes the "United States" for purposes of the FSIA.* Since the United States has some jurisdiction over its Embassy in Iran, it would then follow that Iran had no immunity for tortious acts committed on the Embassy grounds. We think, however, that the modifying words make this construction too awkward to be countenanced. If the definition meant all territory subject to any form of United States jurisdiction, the words "continental or insular" would be surplusage: all territory is continental or insular. The modifying phrase is rather clearly intended to restrict the definition of the United States to the continental United States and such islands as are part of the United States or are its possessions. The ground upon which our Embassy stands in Tehran does not fall within that definition. Hence, Congress intended that, under the statute, Iran should retain its sovereign immunity in this case (emphasis added).

Subsequent to *Persinger*, district courts in the District of Columbia have repeatedly imbued embassies with the characteristics of foreign states.[2] In the

---

[2] The notion that diplomatic envoys to a foreign state were subject to rulings and legislation of their home country as opposed to that of the receiving country was thoroughly established as a practice of diplomacy by the mid-nineteenth century.

context of service of process under the FSIA embassies are treated as foreign states, rather than as instrumentalities of foreign states. *Iskandar v. Embassy of the State of Kuwait*, 2015 WL 3413456, at *2 (D.D.C. May 28, 2015). Thus, the court in *Howe v. Embassy of Italy*, 2014 WL 4449697, *6 (D.D.C. 2014) found that the "Embassy of Italy in Washington, D.C., is an 'integral part of a foreign state's political structure,' making it a 'foreign state….'" And *see Ellenbogen v. The Can. Embassy,* 2005 WL 3211428, *2 (D.D.C. 2005) ("[I]t is well-settled that an embassy is a 'foreign state' ... not an 'agency or instrumentality' thereof"); *see* also *Underwood v. United Republic of Tanzania*, 1995 WL 46383, *2 (D.D.C.  1995)

---

"The whole of an ambassador's suite enjoy the privileges of extraterritoriality in the same manner as the ambassador himself." *Embassies and Foreign Courts: A History of Diplomacy*, London: Bradbury and Evans, 1856. 167. This understanding of the unique role afforded to embassies perseveres in the twenty-first century.

"Today," according to DOS, "an embassy is the nerve center for a country's diplomatic affairs within the borders of another nation …U.S. embassies and consulates abroad, as well as foreign embassies and consulates in the United States, have a *special status.* While diplomatic spaces remain the territory of the host state, an embassy or consulate represents a sovereign state. International rules do not allow representatives of the host country to enter an embassy without permission --even to put out a fire -- and designate an attack on an embassy as an attack on the country it represents (emphasis added)." US Department of State. "What is a U.S. embassy?" http://diplomacy.state.gov/discoverdiplomacy/diplomacy101/places/170537.htm (accessed June 23, 2015).

("[W]e conclude that as a matter of law the embassy of a sovereign nation is a

foreign state which must be served pursuant to § 1608(a)").

The United States, in fact, vigorously asserts elsewhere  American

jurisdiction over US embassies overseas. In *United States v. Corey*, 232 F.3d 1166,

1169 (9th Cir. 2000), the United States successfully prosecuted the defendant for

crimes committed overseas. In doing so, the United States established jurisdiction

by arguing that the crimes occurred on US overseas installations and properties

which are within the "special maritime and territorial jurisdiction of the United

States."  The "special maritime and territorial jurisdiction of the United States"

includes:

> Any lands reserved or acquired for the use of the United States, and
> under the exclusive or concurrent jurisdiction thereof, or any place
> purchased or otherwise acquired by the United States by consent of
> the legislature of the State in which the same shall be, for the erection
> of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3).

As the Ninth Circuit explained:

> Corey, a United States citizen, lived abroad with his family while
> working for the U.S. Air Force…  Corey ran the post office at the
> American Embassy in Manila, the Philippines, and for several years
> before, he managed the office at the U.S. Air Force Base at Yokota,
> Japan…. Corey's stepdaughter, Anna, told her doctor that her
> stepfather had forced her to engage in sexual intercourse with him for
> the previous five years, starting when she was fifteen. After an
> investigation, the government charged Corey with aggravated sexual

12

abuse and sexual abuse… Corey was convicted on eight of eleven counts and sentenced to 262 months in prison….

While Corey lived in Japan, he and his family resided on the Yokota Air Force Base. In the Philippines, they lived at Lopez Court, a private apartment building rented by our embassy for the use of its employees. The government charges that the sexual abuse occurred in each of these residences. Corey argues that neither residence falls within the special jurisdiction of the United States. *Id*., at 1169.  The Ninth Circuit rejected that argument and sided with the United States.  The Ninth Circuit reasoned that:

> Land subject to subsection 7(3) is not "extraterritorial," as the Supreme Court has defined the term. In *Aramco*, the Court described territorial jurisdiction as including "places over which the United States has sovereignty or has some measure of legislative control." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (internal quotation marks omitted). Subsection 7(3) does not purport to regulate conduct within territory over which the United States lacks "some measure of legislative control"; by its terms, it extends only to areas within the concurrent or exclusive jurisdiction of the United States. *See Environmental Defense Fund v. Massey*, 986 F.2d 528, 533 (D.C.Cir.1993) ("[W]here the U.S. has some real measure of legislative control over the region at issue, the presumption against extraterritoriality is much weaker.")….

*Id*., at 1171.  Indeed, as the Ninth Circuit noted, extraterritorial application of American law takes place "where American citizens and property need protection, yet no other government effectively safeguards those interests." *Id.*

The *Corey* Court thus concluded that neither the military base nor the apartment building was extraterritorial, writing:

> By this standard, there is not much question that the Yokota Air Force Base has been acquired for the use of the United States. The United States first occupied the territory upon which the base is located following Japan's surrender in World War II. In negotiating Japan's return to self-government, the Japanese government agreed that the United States would retain control over certain areas of the country, including the territory on which the base is located…. For almost half a century, the United States has used the Japanese land in question in the same manner as it uses American land on which are located domestic military installations.
>
> *Likewise, the United States has acquired Lopez Court for its own use. The State Department leased the apartment building from a private landlord for the purpose of housing our embassy personnel….. The government furnishes and maintains the apartments, and the lease runs without regard to the residence of a particular employee…. In addition to signing the lease, the government pays rent and utilities, and provides security for the buildings…. Lopez Court was not Corey's private residence; it was an apartment acquired by the State Department for governmental use.*
>
> Thus, both the Yokota Air Force Base and Lopez Court are lands "reserved or acquired for the use of the United States" within the meaning of subsection 7(3) (emphasis added).

*Id*., at 1177.  Because the United States successfully argued in *Corey* that an overseas apartment building leased by the US Embassy for the use of its embassy personnel were within the special territorial jurisdiction of the United States, convictions for violations of US law at those buildings were affirmed.  Nor was the US position in *Corey* an isolated assertion by the United States of  jurisdiction overseas.

Seventeen years earlier, in *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973), the United States successfully pursued an identical claim. In 1971, in the American Embassy in the new Republic of Equatorial Guinea, Alfred Erdos killed Donald Leahy. Both were American citizens and embassy employees, with Erdos occupying the position of senior diplomat or charge d'affairs. Returned to the United States, Erdos was tried and convicted of voluntary manslaughter in the District Court for the Eastern District of Virginia. *Id.,* at 158. The Fourth Circuit affirmed, holding that "18 U.S.C. § 7(3) is a proper grant of 'special' territorial jurisdiction embracing an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction." *Id*., at 160.[3]

---

[3] The United States has not always prevailed on this issue. For a detailed counter-argument, *see United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000). Appellants do not here engage in the exhaustive and conflicting exercises in statutory construction undertaken in *Corey* and in *Gatlin*, except to contend that the *Corey* approach championed by the United States is well-reasoned, and that the United States is judicially estopped from changing its position in *Corey* and *Erdos*. Judicial estoppel is designed to "prohibit[ ] parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The United States is subject to the estoppel, if its elements can be established. *Yan Zhao v . United States*, 2013 WL 2945157, at *7-8 (W.D.N.Y. 2013). Whether such an estoppel has a practical effect on subject matter jurisdiction analysis is a question subject to the obligations of the district court to determine its jurisdiction, irrespective of the positions of the parties. But *see Hohri v. U.S*., 793 F.2d 304, 315 (D.C. Cir. 1986) pet. reh. den. ("Second hearings" on questions of subject matter jurisdiction are disfavored.) and *LaShawn v. Barry*, 87 F.3d 1389, 1394 (D.C. Circ. 1996)("(T)his court and other courts of appeal routinely apply law-of-the-case preclusion to

The United States has, thus, successfully secured rulings which imbue embassies and overseas installations with nation-state characteristics which conflict with sovereign claims of the host nation. The historic treatment of embassies on issues ranging from temporary sanctuary [4] to immunity [5] underscores the unique placement of embassies beyond the reach of host nations.

It is certainly true that a fragmented line of cases has held that events at overseas installations, including embassies, must be construed to have occurred within the "foreign country" for purposes of the FTCA.

In *Beattie, supra,* 756 F.2d at 97 which advanced the headquarters exception abrogated by *Smith v. United States*, 507 U.S. 197, 113 S. Ct. 1178, 122 L. Ed. 2d 548 (1993), the District of Columbia Circuit wrote:

> A variety of cases have been cited which merely decide that, despite outward appearances, the situs of the acts or omissions was a foreign country. For example, torts occurring on American embassies or military bases which are located in foreign countries are barred by the foreign country exception. *This is also related to the idea that embassies and military bases in foreign countries often operate under agreement to apply that foreign country's laws in cases occurring there* (emphasis added).

questions of jurisdiction.") for the view that subject matter jurisdiction arguments may be circumscribed certain procedural events).

[4] *See, e.g.*, Arturo E. Balbastro, *Right of Diplomatic Asylum*, 34 PHIL. L.J. 343, 348 (1959)

[5] *See, e.g*, Restatement (Second) of Foreign Relations Law § 77 (1965)

A variety of other cases make subtle distinctions as to the level of sovereignty existing in some foreign land…. Since Antarctica, by agreement, is not now and never has been subject to the sovereignty of any nation, the present case does not require such an analysis.

More recently, in *Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 119 (D.D.C. 2010) aff'd on other grounds *sub nom. Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012), the district court held that the claims of Guantanamo detainees arose in a foreign country because "(t)he United States does not have sovereignty over Guantanamo in the 'legal and technical sense,'…and as such, FTCA claims arising there are barred by the foreign country exception (internal citations omitted)." As with most of the case law in this line of cases, the court looked to the Supreme Court's 1949 decision in *United States v. Spelar*, 338 U.S. 217, 219, 70 S. Ct. 10, 11, 94 L. Ed. 3 (1949), in which the Court wrote:

> By the exclusion of 'claims arising in a foreign country,' the coverage of the Federal Tort Claims Act was geared to the sovereignty of the United States….The arrangements under which the leased bases were acquired from Great Britain did not and were not intended to transfer sovereignty over the leased areas from Great Britain to the United States.' Harmon Field, where this claim 'arose,' remained subject to the sovereignty of Great Britain and lay within a 'foreign country.'

None of those cases, however, addressed either the special statutory jurisdiction of the United States, discussed above, or the overarching changes in sovereign reach affected by US treaty obligations and protections. In the latter regard, The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T.

17

3227, 500 U.N.T.S. 95 (the "VCDR"), an international agreement to which the

United States is a party, *Wyatt v. Syrian Arab Republic*, 2015 WL 1623937, at *2

(D.D.C. 2015), restructured and re-allocated at its core the legal, diplomatic and

sovereign reach of sending and receiving states over embassies, diplomatic

missions and facilities for diplomatic agents at embassies and missions.[6]

> The principle source of modern international law regarding the conduct of intergovernmental relations is the Vienna Convention on Diplomatic Relations ("Convention"), drafted in 1961[7]. Ratified by 190 parties, the Convention lays out a comprehensive structure within which states may peacefully interact to conduct their affairs…. Because of the provisions' universal acceptance and duration of enforceability, these standards of conduct have formed non-derogable, customary norms.

Daniel Capone, *Diplomatic Asylum: A New Path Forward,* 41 N.C.J. Int'l L. 221, 223 (2016)

The VCDR provides, *inter alia*, at Article 1, as follows:

---

[6] Congress has authorized the Secretary of State to acquire by lease residential properties for the officers and the employees of the Foreign Service. 22 USC § 291 provides, in pertinent part, as follows:

The Secretary of State may lease or rent, for periods not exceeding ten years, such buildings and grounds for the use of the Foreign Service as may be necessary; and he may, in accordance with existing practice without cost to them, and within the limit of any appropriation made by Congress, furnish the officers and employees in the Foreign Service with living quarters, heat, light, and household equipment in Government-owned or rented buildings, at places where, in his judgment, it would be in the public interest to do so…..

[7] Haiti acceded to the VCDR on February 2, 1978.

For the purpose of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

(a) The "head of the mission" is the person charged by the sending State with the duty of acting in that capacity;

(b) The "members of the mission" are the head of the mission and the members of the staff of the mission;

(c) The "members of the staff of the mission" are the members of the diplomatic staff, of the administrative and technical staff and of the service staff of the mission;

(d) The "members of the diplomatic staff" are the members of the staff of the mission having diplomatic rank;

(e) A "diplomatic agent" is the head of the mission or a member of the diplomatic staff of the mission;

(f) The "members of the administrative and technical staff" are the members of the staff of the mission employed in the administrative and technical service of the mission;

(g) The "members of the service staff" are the members of the staff of the mission in the domestic service of the mission;

(h) A "private servant" is a person who is in the domestic service of a member of the mission and who is not an employee of the sending State;

(i) The "premises of the mission" are the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission.

The VCDR also provides, at Article 22, as follows:

1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

The VCDR also provides, at Article 29, as follows: the person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

The VCDR also provides, at Article 30, as follows:

1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

2. His papers, correspondence and, except as provided in paragraph 3 of article 31, his property, shall likewise enjoy inviolability.

The VCDR also provides, at Article 31, *inter alia*, as follows:

1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(a) A real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b) An action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c) An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

20

2.   A diplomatic agent is not obliged to give evidence as a witness.

The VCDR therefore fundamentally restricted the reach of the host nation, with a concomitant expansion of the inviolable[8] immunities of the sending state "…Only if the head of mission expressly waives the rights of immunity or territorial inviolability can a host nation enforce its municipal law within the mission. The territory of foreign diplomatic missions is subject to host nation jurisdiction in only the ephemeral sense." Capone, *Diplomatic Asylum, supra,* at 223-224.

The effect of this treaty on the jurisdictional calculi for the FTCA should not be minimized.

As the Supremacy Clause makes clear:

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, § 2

Even under *Spelar*, the omnipresent reach of the United States into its overseas embassies and facilities, and the concomitant withdrawal by treaty of the

---

[8] Inviolability and functional necessity have, arguably, supplanted extraterritoriality in the sense of a physical extension of the sending state as the rationale for the principles adopted in the VCDR. Capone, *Diplomatic Asylum, supra,* at 224-225.

receiving state of its reach, reflects a re-allocation of "sovereignty" in the context of the FTCA which warrants a consistent application of American law to the United States as both prosecutor and civil defendant. No underlying jurisprudential principle justifies a "territorial"- based application of American criminal law to the same situs which is beyond the reach of civil claims against the United States by the very diplomats who were directed to and housed in that location by the United States.

Looking astride the "natural reading," *King v Burwell supra,* of the phrase "foreign country," the Court should conclude that the tailored abrogation of an ancient immunity at the heart of the FTCA did not contemplate the exclusion from the new class of permitted claimants those American employees serving –because of the instruction of, and under the ostensible protection of, the United States –on American property overseas.

The United States, however, contends that this Circuit's decisions in *Broadnax v. United States* 710 F.2d 865 (D.C.Cir. 1983) (per curiam) and *Macharia v. United States* 334 F.3d 61 (D.C. Cir. 2003) "held that the foreign country exception bars claims based on injuries occurring at overseas embassies and military bases." Reply In Support Of Motion For Summary Affirmance, At 5. (Doc. 1621911).

22

In *Broadnax,* however, plaintiffs' FTCA claims arose out of medical treatment in a United States Army hospital in Nuremberg, Germany. 710 F.2d at 866.[9] The Court neither addressed, nor had reason to address, the unique characteristics of diplomatic venues protected by treaty.

In *Macharia*, this Circuit affirmed the district court's application to all claims in the case of the "discretionary function" exception codified at 28 U.S.C. § 2680(a). 341 F.3d at 65-68. The *Macharia* decision affirmed the district court's dismissal of "appellants' allegations of negligence by Embassy guards," *id*., at 68, on the basis of the discretionary function, the independent contractor exception and the foreign country exception. *Id*., at 68-69. But the Court's brief discussion of the foreign country exception focused only on the presence of the supervising US employee  "overseas – in this case Nairobi," *id*., at 69, and observed that "the FTCA's  sovereign immunity waiver does not extend to acts or omissions  arising in territory subject to the sovereign authority of another nation."  *Id.* The *Macharia* decision did not address, explicitly or implicitly, whether American embassies themselves – rather than US employees who are "overseas" – invoke unique

---

[9] Appellee's reliance on  *Heller v. United States,* 776 F.2d 92 (3d Cir.1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986) is misplaced, for the same reason. It involved a claim of medical malpractice at an Air Force hospital in the Philippines.

territorial or jurisdictional characteristics which take them outside the definition of a "foreign country" for purposes of the FTCA.

The United States thus points to no authority in this Circuit which compels the conclusion that otherwise actionable conduct under the FTCA is immune if it occurs at an American embassy.  The United States fares no better in other circuits.

Relying on *Meredith v. United States* 330 F.2d 9, (9th Cir.), *cert. denied* 379 U.S. 867 (1964), and *Corey v. United States* 232 F.3d 1166, (9th Cir. 2000), *cert. denied* 534 U.S. 837 (2001), the United States contends that the Ninth Circuit  has held that claims arising at overseas embassies and bases are barred by the foreign country exception. Opposition to Appellants' Motion for Summary Reversal at 5, n.1 and accompanying text.  But *Meredith*, which arose out of conduct in Thailand, was decided more than 20 years after Thailand ratified the VCDR. As the *Corey* court explained:

> The  SOFA[10]  with  Japan  and  the Vienna Convention on  Diplomatic Relations  delimit  the  respective  spheres  of  jurisdiction  over  the territory reserved for the use of American soldiers and diplomats. … The  Vienna Convention severely       constrains       the       Philippine government's jurisdiction  over  U.S.  embassy  territory,  just  as  the SOFA limits the Japanese government's control over the Air Force Base. In turn, these treaties grant the United States the power—and the responsibility—to regulate affairs on those territories. Indeed, the treaties leave the United States with substantially greater authority to regulate conduct than the host country. For us to decline jurisdiction

---

[10] Status of Forces Agreement.

24

in this case would upset the jurisdictional balance established by these treaties…. (internal citations omitted). *Corey*, 232 Fed.3d at 181.

The Ninth Circuit in *Corey* thus emphasized the effect of the VCDR on the respective jurisdictional reaches of the sending and the receiving state. Nothing in *Broadnax*, *Macharia* or *Meredith* can be construed to have addressed, much less quarreled with the view successfully espoused by the United States in *Corey* that the VCDR imbued in the United States jurisdictional power which fundamentally altered the respective territorial positions of the acceding states. Corey, in fact, made clear that:

> *Although Lopez Court remains Philippine territory in some sense, diplomatic conventions disable the Philippine government from exerting effective control over the area*. The local police could not enter the premises to investigate crimes without the consent of the ambassador. Nor could they prosecute Corey, or any other American member of the embassy staff. *The United States has the real power— and the concomitant duty—to regulate conduct on those grounds.*
>
> Thus, we conclude that *the United States exercises concurrent, and indeed primary, jurisdiction over the actions of United States nationals on both the Yokota Air Force Base and Lopez Court*. This conclusion arises out of the plain meaning of subsection 7(3), the relevant international agreements, and the practical realities of the situation. The United States has negotiated a modus vivendi with both Japan and the Philippines for the lands *under United States dominion* in their respective countries. Were we to hold that federal court jurisdiction is not coextensive there with, we would risk destabilizing the accommodation that the Executive Branch has worked out with the foreign powers (emphasis added).

This Circuit in *Macharia* addressed the foreign country exception by stating that the FTCA's sovereign immunity waiver does not extend to acts or omissions arising in "territory subject *to the sovereign authority* of another nation (emphasis added)." 334 F.3d at 69. The United States emphasized that formulation below, ECF 7, at 7, and that focus on "authority" conforms with the United States' successful positions in *Corey* and *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973).

As *Corey* points out, the VCDR disables the receiving state from exercising effective control over the area, gives the sending state the "real power … to regulate conduct on those grounds," awards the receiving state "substantially greater authority to regulate conduct than the host country," and grants to the sending state "primary jurisdiction" and "dominion" over the embassy facilities. Thus, the American Embassy facilities in Haiti, as a matter of treaty and international law, cannot have been subject to the "sovereign authority" of Haiti. *Macharia*, at 69.

Under the law of this Circuit, therefore, the foreign country exception to the FTCA's waiver of immunity is not applicable to plaintiffs' claims.

## CONCLUSION

26

For the reasons set forth above[11] the judgment of the District Court should be reversed and the case remanded for disposition on the merits of Plaintiffs' claims.

## REQUEST FOR ORAL ARGUMENT

    /s/    Philip M. Musolino
Philip M. Musolino, Esq. #294652
Musolino & Dessel PLLC
1615 L Street, NW Suite 440
Washington, DC 20036
Phone: (202) 466-3883
pmusolino@musolinoanddessel.com

Dated:        October 31, 2016

---

[11] Appellants do not address here alternative arguments made below by the United States, where such arguments were not addressed or relied upon by the District Court. *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010) ("Petitioner does not waive a challenge to any ground for denial of certification in its opening brief on appeal that was not relied on in the district court's order.")  Appellants reserve the right to address any such arguments in their reply brief.

## CERTIFICATE OF COMPLIANCE

Counsel certifies as follows:

  1. This brief complies with the type-volume requirement of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,834 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

  2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

       /s/ Philip M. Musolino
      Philip M. Musolino, Esq. #294652
      Musolino & Dessel PLLC
      1615 L Street, NW Suite 440
      Washington, DC 20036
      Phone: (202) 466-3883
      pmusolino@musolinoanddessel.com

## CERTIFICATE OF SERVICE

  I certify that an electronic copy of this motion was served on all ECF parties through the ECF system this 31st day of October, 2016.

       /s/ Philip M. Musolino
      Philip M. Musolino, Esq. #294652
      Musolino & Dessel PLLC
      1615 L Street, NW Suite 440
      Washington, DC 20036
      Phone: (202) 466-3883
      pmusolino@musolinoanddessel.com